JOHN KING McLANAHAN, Appellant, *v.* JORDON L. MOTT and Others, Respondents.

*Lottery — corporate bonds to be redeemed before maturity, as determined by lot — what corporation is subject to the United States laws — if located in the State of New York alone it is a domestic corporation — query, if located also in another State.*

The bonds of a corporation were to be issued to run 450 years, bearing interest at six per cent per annum, two per cent payable on the first day of January and two per cent on the first day of July in each year, and the remaining two per cent to be paid with the principal upon the maturity of the bonds; it was provided that certain of the bonds, determinable by lot, were to be retired on each semi-annual interest day, and paid at their maturity value, and the directors and stockholders declared the maturity value of each bond designated by lot for retirement to be the amount of the bond and annual interest thereon at two per cent from July 1, 1893, for 450 years.

*Held,* that the scheme of redemption of the bonds adopted by the corporation constituted a lottery, and was invalid and unlawful under the statutes of the United States.

A corporation created by Congress for the purpose of carrying out an object respecting which it has the exclusive power to legislate, if it is located in the State of New York alone, is a domestic corporation, but, whether a domestic corporation or not, as it derives its powers and faculties from the United States, and from no other source, it is bound by whatever limitations, and is subject to whatever disabilities, grow out of the United States laws.

*Query,* whether such a corporation created by Congress, and located in the State of New York and in another State, would be a domestic corporation.

APPEAL by the plaintiff, John King McLanahan, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the city and county of New York on the 16th day of May, 1893, upon the decision of the court rendered after a trial at the New York Special Term, sustaining a demurrer interposed by the defendants to the plaintiff's complaint, and dis-

missing the complaint, with notice of an intention to bring up for review on such appeal the order or decision of the New York Special Term, entered in said New York county clerk's office on the 16th day of May, 1893.

*Burton N. Harrison,* for the appellant.

*David McClure,* for the respondents.

Patterson, J.:

The appeal in this case is from a judgment directed at Special Term, sustaining a demurrer and dismissing the complaint to which it was interposed. The plaintiff is a stockholder in the North River Bridge Company, a corporation organized and existing under an act of the Congress of the United States (Chap. 669, Laws 1890 ; 26 Stat. at Large, 268), and authorized by its charter to construct a bridge and its approaches over the Hudson river from New York city to New Jersey, and to issue bonds and secure the same by mortgage on its property, rights and franchise. It is alleged in the complaint that the corporation, assuming to act under the authority conferred upon it by the Congress, " intends and threatens and is about to issue its bonds, secured by a trust deed, to the amount of, not exceeding in the aggregate, one hundred million dollars, the principal to become due on the first day of July, A. D. 2343, and to bear interest at the rate of six per centum per annum, of which two per centum shall be payable on the first day of January, and two per centum on the first day of July in each year, and the remaining two per centum shall be payable with the principal on July 1st, A. D. 2343 ; the payment of the principal and interest of said bonds to be secured by a first mortgage or deed of trust upon said company's bridges, approaches, terminals, appurtenances and works connected therewith, and on said company's property and rights of property of all kinds and descriptions now held, or that may hereafter be acquired, and upon its franchise to be a corporation, and said bonds to be gradually liquidated, and to that end to be gradually paid off and redeemed on interest days at their maturity value, according to the numbers called in and designated by the trustee at least one month before each interest day, said bonds to be registered and in denominations of one hundred dollars, and to be numbered from

one to one million inclusive," etc. The general outline of a plan for raising money by putting out a loan being thus stated, the pleader proceeds to set forth certain of its details, and that the corporation by resolution adopted the form of a bond, which was also approved by a majority of the stockholders of the company; but that the company or its directors have modified the form of the bond as proposed and adopted, and instead thereof purpose and threaten to issue a bond containing the following provision, viz.: "That this bond is subject to be redeemed before maturity *at its maturity value,* in accordance with the provisions of the said mortgage or deed of trust." It is then alleged in the complaint that the clause of the mortgage referred to respecting the redemption of bonds is as follows, viz.: "*Third.* A sinking fund shall be created and maintained for the gradual payment or redemption of the bonds hereby secured. It shall consist of and be maintained by a payment by the said company to the said trustees, before each interest day, of $400,000, together with an additional sum of money equal to the semi-annual interest at two per centum on the total number of bonds previously redeemed and canceled as herein provided, and the said trustee shall, at least one month prior to each interest day, designate by lot as many bonds for redemption at their maturity value as the moneys in said sinking fund on such interest day will suffice to pay, and said bonds so designated shall, on such interest day, be paid and redeemed at their maturity value," etc. It is further stated in the complaint that the directors and stockholders of the corporation have declared a certain meaning to be attached to the words, "at their maturity value," used in the clause of the mortgage quoted, which meaning is that for each bond of $100, designated by lot for redemption prior to maturity, there shall be paid the sum of $1,000, such fixed maturity value being arrived at by adding to the principal of $100 the items of annual interest at two per cent, from July 1, 1893, for 450 years. It is also averred that the said directors, etc., of the company, "intend and threaten, if it should be necessary or expedient to facilitate the floating of said bonds, to make a supplemental agreement that such (as has been stated) is the meaning (of the words "maturity value," in the instruments above mentioned); that the plaintiff has remonstrated in vain against this scheme as

unlawful, and he insists that it "is contrary to public policy, an abuse of the corporate powers of the defendant company, and contrary to the statutes of the State of New York, in this, among other things, that it is in violation of the statutes prohibiting lotteries and lottery schemes." The relief prayed for is a perpetual injunction, restraining the execution of any deed of trust containing the provision referred to respecting the redemption of bonds "at their maturity value."

The right of the plaintiff to maintain this action is not challenged. The demurrer proceeds on the ground only that the complaint does not state facts sufficient to constitute a cause of action, and on the argument the whole subject of the legality of the scheme devised by the corporation for raising money has been brought up for judicial consideration. The general inquiry is, does the scheme adopted come under the condemnation of any statute, principle of law or well-grounded dictate of public policy? It does not require much analyzing to ascertain that the plan objected to by the plaintiff is one which seeks to unite, in a very ingenious manner, investment, with what is wonderfully like gambling, if it is not gambling pure and simple. There is nothing unlawful in the long term the bonds have to run, although they would be practically irredeemable if all were not to mature until after the expiration of 450 years. But it is perfectly obvious that the redemption feature is the real and only attraction connected with the scheme, and that the inducement offered to purchase the bonds is the chance of holding lucky numbers, and receiving on a determination to be made by lot $1,000 for $100, possibly in six months or a year, or in one of the earlier semi-annual drawings to be made by the mortgage trustee, or, in other words, that the holder of one bond may by mere chance get in six months what would not be realized on another in 450 years. That this scheme is a lottery; that to the mere decision of chance is to be left what bonds shall be retired at the enormous increase contemplated, is as plain as if the loudest proclamation were made of it. It is not at all likely that the whole, or any considerable part of an issue of $100,000,000 of bonds in the denomination of $100 each, bearing interest at four or at six per cent, and having nearly five centuries to run, and with no other property or security behind it, at the date of issue than a mere mortgage on a franchise, would be

marketable without some special inducement to purchasers, and that has been provided here. The redemption feature, which holds out the hope to a purchaser of speedily obtaining tenfold for his outlay, and as it were by the turn of a wheel or the casting of lots, is the real attraction. It defines the whole plan, stamping it with the character of a lottery, all the real qualities of which it possesses. The element of selecting bonds for redemption is not of itself an objectionable feature. It is the chance of winning at an early drawing ten times the face value of a bond that constitutes illegality if there is any illegality in the scheme. There are various definitions of the word lottery given in the books, no one of which includes each and every known or conceivable scheme that properly may be designated by the term. It would serve no useful purpose to refer to them here. Let it suffice that we are satisfied that the scheme of redemption of the bonds adopted by this corporation constitutes a lottery in the popular as well as in the technical sense of the term, and that it is apparent that on that feature reliance is placed for finding a market for the bonds.

There is no rigid rule of law independent of legislation, nor do we know of any requirement of a universal public policy, which absolutely condemns the plan of this particular corporation for raising money by the sale of bonds secured by mortgage, although that plan does involve a feature of redemption at enormous increase by chance. Lotteries were once not only tolerated, but were authorized and regulated by law in many countries and in States of this Union, and they exist and have recognition in at least two of such States to-day. They have been used in times past by civil governments, by ecclesiastical authorities, by academic and charitable institutions, to raise money for many of the most laudable and beneficent objects known among men. But the evils arising from the vice of gambling, of which they are a species, have induced most States to place them under the ban of the law, and to attach heavy penalties to the violation of statutes interdicting them. Such laws exist in the State of New York, and there are on the statute books of the United States enactments directly affecting the subject. We think the legality of the scheme under consideration must be determined by legislation affecting it, and the question, therefore, arises, what law is applicable, that of the State of New York or of the United States?

It is earnestly urged in argument that the legality of the device under consideration must be determined by the law of the State of New York, and that as the statutes of the State relative to lotteries have been explained and interpreted by the courts, it is free from any taint of illegality. We suppose that the claimed application of the law of New York is based upon the circumstance that the company is regarded by the plaintiff as a domestic corporation. Undoubtedly, being created by the Congress for the purpose of carrying out an object respecting which it had the exclusive power to legislate, if it were located in the State of New York alone it would be a domestic corporation. The Code of Civil Procedure declares it to be so. (§ 3343, subd. 18.) But this corporation is located in two States, and, therefore, possibly it may not come under the designation of a domestic corporation. We do not decide that point, but even if it were a domestic corporation it does not follow therefrom that it possesses the same powers that corporations of a like kind, chartered or organized by State authority have, or that it is to be regulated or controlled by the laws applicable to them. It derives its powers and faculties from the sovereign creating it, and from no other source, and is bound by whatever limitations and is subjected to whatever disabilities grow out of the laws of that sovereign. Indeed, it is a familiar precept that every rule of law of the sovereign creating a corporation and affecting the corporate rights and acts and business, is just as much a part of its being as if written in its charter. Hence, in this case there being legislation of the Congress, which, by necessary relation, applies to this scheme, we do not consider it would be either desirable or profitable to trace the history of, or critically examine the adjudications relating to, lotteries in this State.

The validity of the provisions of the proposed mortgage is not to be tested by our law, but by the effect to be given to a certain statute of the United States, and by that statute this scheme must be pronounced unlawful.

By section 3894 of the United States Revised Statutes, it is made a misdemeanor, punishable with fine and imprisonment, for any person to use the mails for the purpose of sending by them a lottery ticket or of circulating any newspaper, pamphlet, circular or other publication of any kind containing any advertisement of any lottery

or gift enterprise or prize scheme depending upon chance, and as this statute has been construed in the case hereafter cited, it is entirely immaterial whether the lottery, etc., is considered elsewhere legal. This emphatic denunciation of lotteries it is true has taken but the one particular form and direction, but it is perhaps the only way in which the Congress, with its exclusive power to regulate post offices and the postal service, could effectively, and within its competency, legislate upon the subject at all. But the necessary result of such an enactment is to bring schemes like that of this corporation under the condemnation of the law. We do not consider it necessary to elaborate the subject. It has been treated at large in the opinion of the court by Mr. Justice BLATCHFORD in the Austrian bond case (*Horner* v. *United States*, 147 U. S. 449). The language quoted in that case from Judge BLODGETT in *United States* v. *Zeisler* (30 Fed. Rep. 499), has a singular appropriateness, *mutatis mutandis*, to the case at bar. "If these drawings determined only the time when the bonds would be paid, I should say that the mere determining of that time by lot or drawing would not give them the characteristics of a lottery; but when a city or a government, in order to make an inducement for people to buy their bonds, holds out large prizes to be drawn by chance or determined by lot in the manner in which prizes are usually determined in even an honestly conducted lottery, it seems to me it comes clearly and distinctly within the inhibiting clause of the statute," etc., " and hence it seems to me that the purpose of the scheme was not only to determine by lot when the bonds were to be paid, but also to determine *certain extraordinary chances to the holders of the fortunate numbers drawn.*" In the present case one of the "extraordinary chances" is that of a fortunate holder getting 450 years' interest at two per cent in six months.

The judgment at Special Term is reversed and judgment directed overruling the demurrer, and for the relief demanded in the complaint, with costs.

FOLLETT and PARKER, JJ., concurred.

Judgment reversed and judgment directed overruling demurrer, and for the relief demanded in the complaint, with costs.